Roy & Josie FISHER, et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

Anita LOHR, et al.,

and

Sidney L. Sutton, et al., Defendants–
Intervenors.

Maria MENDOZA, et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

TUCSON UNIFIED SCHOOL DISTRICT
NO. 1, et al., Defendants.

No. CIV 74–090, CIV 74–204.

United States District Court,
D. Arizona.

May 4, 1993.

J. William Brammer, Jr., Tucson, AZ, for Tucson Unified School Dist. No. 1.

Paul D. Julien, Tucson, AZ, for Catalina respondents.

Ruben Salter, Jr., Tucson, AZ, for plaintiffs Fisher.

Michael Zavala, Tucson, AZ, for plaintiffs Mendoza.

John R. Moore, U.S. Dept. of Justice, Washington, DC, for Dept. of Justice.

## MEMORANDUM DECISION

MARQUEZ, Senior District Judge.

Tucson Unified School District No. 1 (hereinafter "District") filed this Petition for Approval of the Closure of Catalina High School and Redrawing of High School Attendance Boundaries to which a new "class"[1] of Catalina Respondents and the original classes of Fisher and Mendoza Plaintiffs have filed opposition thereto. Additionally, Plaintiffs in the *Underwood v. TUSD* case[2] have filed their objection to the part of the Catalina closure and reassignment plan, which provides for the matriculation of Jefferson Park Elementary area students to Tucson High Magnet School, based on the disparate impact it would have on Tucson High's already predominantly minority enrollment. Plaintiff–Intervenor United States of America initially responded to the District's petition asserting no objection with an exception to the reassignment of the Jefferson Park students; however, upon hearing the testimony regarding the potential effects the construction of a new high school in the Southwest portion of the District may have, it is the United State's position that the District has failed to meet its burden as set forth in the discussion to follow.

## FACTS

The Court adopts the Findings of Fact and Conclusions of Law entered on June 5, 1978 in the original action between Plaintiffs Fisher and Mendoza for the exclusive purpose of their extensive usefulness in providing background information in understanding the posture of the present action now before the Court.

The parties to this present action have filed a statement of uncontested and contested facts, providing the Court with a factual background, including but not limited to: (1) facts regarding the decision to close Catalina High School; (2) facts relating to the District's motives; (3) facts concerning the racial balance of schools within the District; (4) facts concerning the transfer of students from Catalina to the different high schools in the District; and (5) facts relating to the decision to build a new high school in the Southwest portion of the District. The Court adopts the uncontested facts by reference, taking notice of the stated exceptions, and incorporates this factual background into the following discussion.

## DISCUSSION

### I. Introduction

On February 18, 1993, the Governing Board took action to close Catalina High School and on that date, reassigned all the former Catalina attendance area students among several other District high schools as follows:

(1) students in the Cavett Elementary attendance area and Southern part of the District were assigned to Santa Rita High School;

(2) students residing in the attendance area of Jefferson Park Elementary School were assigned to Tucson High Magnet School;

(3) students in the centrally located Cragin and Blenman Elementary School attendance areas were assigned to Palo Verde High

---

1. Because of time constraints, Catalina Respondents did not seek formal certification as a class. However, there has been no opposition from the District to the Court treating Catalina's objection to the petition as a representative action and the Catalina Respondents have made a prima facie showing that they satisfy the prerequisites for certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

2. An action brought by parents of Tucson High Magnet School students, challenging the adequacy of the programs and facilities available to minority students, in which a proposed consent decree has been approved by the Court.

School, as were the students living in the portion of the Hudlow Elementary attendance area which attends Utterback Middle School;

(4) students residing in the Davidson Elementary School attendance area and the Townsend Middle School area West of Craycroft Road, not previously assigned to Sabino High School, were both assigned to attend Sabino High School; and

(5) students living in the Wright Elementary School attendance area were assigned to Sahuaro High School.

The District asserts that it attempted to produce a roughly equivalent burden on each former Catalina area being reassigned in terms of the relative distance each of the areas would need to have its students travel to attend high school and enroll students in high schools with available space while at the same time moving the racial/ethnic balance of the student enrollment at those schools closer to the district-wide average.

## II. Consideration of the Proposed Construction of New High School in the Southwest Area of the District

■ The District concedes that to the extent that the District does not have the funds to renovate Catalina, build a new high school, and staff, equip, and maintain both schools, the decision to close Catalina is related to the District's decision to build a new high school.[3] Yet it is the position of the District that the Court consider the closure of Catalina High independent of the construction of a new high school.

The closure of Catalina High School and the construction of a new high school in the Southwest area of the District cannot be addressed independently as urged by the District. Evidenced by certain projections made by the District, these two actions have been considered collectively. Additionally, Governing Board President Robert Miranda agreed that these issues were considered in

connection with one another when the Governing Board made its decision.[4]

The Court cannot blindly address the closure of Catalina, solely, when the construction of the new high school is enmeshed with this action, and the resulting impact will ultimately have the effect of interfering with the on-going efforts to reduce segregation.[5]

## III. Standard of Review

The District argues that because its high school system has never been declared unconstitutional because of the existence of de jure segregation, and in fact, has been determined free from such segregation, and further because no finding has been made that the District as a whole has ever operated as a dual system, this Court's review is limited to whether the District, by closing Catalina High School, has committed an act of intentional segregation prohibited by the United States Constitution.

The Court does not question the motive or intent of the Governing Board's decision; nor is it necessary to do so. What is at issue is the legality of the Governing Board's decision, not the wisdom of it.

The Court must apply the standard of review set forth as follows in Paragraph 20 of the Stipulation of Settlement, which was approved by the Court on August 11, 1978:

Defendants will not undertake the construction of new schools or of permanent additions at existing schools without specific authorization of the Court. Nothing in this stipulation shall preclude the construction of new schools in the future if the construction of such schools is deemed to be in the **best interest of the community and not inconsistent with on-going efforts to reduce segregation,** nor shall anything herein preclude revision of student transportation patterns for the purpose of having the effect of reducing or eliminating the transportation of students called for in this stipulation, consistent

---

3. Defendant's Reply to Catalina Respondents' Objection to Defendants' Petition to Close Catalina High School and Redrawing of High School Attendance Boundaries, pages 33–34.

4. Transcript of Hearing, April 22, 1993, pages 85–86.

5. It is projected that the minority student enrollment at a new Southwest high school will be 70 percent and that the minority enrollments at Pueblo High School and Cholla High School will increase from 89 percent to 92 percent and 74 percent to 80 percent, respectively.

with on-going efforts to reduce segregation. [emphasis added]

■ The Court is further guided by the criteria referred to by Plaintiffs Fisher and Plaintiff–Intervenor United States of America, set forth in two parts as follows: (1) whether the closure will have an adverse effect on the District's ongoing desegregation obligations; and (2) whether the impact of the closure places a disproportionate burden on minority students. *See Harris v. Crenshaw County Board of Education,* 968 F.2d 1090 (11th Cir.1992).

■ Accordingly, the District has the burden to show that the construction of any new schools, and thus the closure of Catalina High School, is: (1) deemed to be in the best interest of the community; (2) not inconsistent with on-going efforts to reduce segregation; and (3) that the closure does not place a disproportionate burden on minority students.

■ The Court finds that the District has failed to meet its burden.

While the District cites case law in support of its position and refers to the Court's Findings of Fact and Conclusions of Law issued in this case on June 5, 1978, as previously determined, these findings may only be relied upon for providing background information. Paragraph 23 of the Stipulation of Settlement specifically states:

> Once this Stipulation of Settlement becomes effective, the rights and obligations of the parties shall be determined solely by its terms and the terms of any subsequent stipulations or orders entered herein pursuant to it. ... Further, in seeking enforcement of or relief in any federal court from the terms of this stipulation, no party may rely upon prior findings and conclusions in this case to interpret the terms of this stipulation or to determine the rights and obligations of the parties thereunder.

While the District cites Paragraphs 19 and 21 of the Stipulation of Settlement to "provide insight as to its purpose and to this Court's duties in reviewing proposed District acts and policies,"[6] the District conspicuously omits the language of Paragraph 20, which determines the standard of review.

While it is correct that the Stipulation of Settlement would not compel the District to use bond funds to renovate Catalina, should this Court ultimately deny the District's request to build a new high school, the Court cannot concern itself with the financial aspects of the Board's decisions.

Respondents refute the District's assertion that the facts fail to establish that the closure of Catalina High School would have a legally impermissible impact on minority students or be inconsistent with on-going efforts to reduce segregation by arguing that the District's petition to close Catalina destroys the District's only ethnically-balanced high school and causes great hardships for hundreds of minority students and their families.

During the hearing held in this matter, Respondents illustrated for the Court and elicited testimony which supports a finding that the closure of Catalina, located in the center of the District, and the construction of a new high school in the Southwest area of the District, would in effect divide the District into four ethnic identifiable Westside high schools and five predominantly Anglo Eastside high schools.

As of October 13, 1992, the District's total minority high school population was 48.7 percent. As of that date, Catalina's minority student population was 48.99 percent of the student body. While Rincon High had a minority population of 48.87 percent on that date, it houses University High School on its campus, which had a minority population of only 29 percent. Based on projected enrollments for the 1993–94 school year, the transfer of Catalina High students would result in projected high school student minority populations of: 32 percent at Santa Rita; an increase to 14 percent at Sabino; an increase to 21 percent at Sahuaro; 36 percent at Palo Verde; and 51 percent at Rincon, exclusive of University High. Tucson High is projected to remain at 76 percent. Catalina students would not be transferred to Pueblo and Cholla High Schools, with minority student

---

6. Defendant's Reply, page 8.

populations remaining at 89 and 74 percent, respectively.

With the construction of a new Southwest area high school, which would have a projected minority student enrollment of 70 percent,[7] it is projected that the minority student population would increase to 92 percent at Pueblo and 80 percent at Cholla.

The closure of Catalina would not only eliminate the most ethnically-balanced high school in the District, but would also adversely affect minority students who would be transferred to ethnically imbalanced schools and the minority students from Cavett and Jefferson Park Elementary School areas. Tucson High Magnet School is already 70 percent minority and the magnet program has not reduced this level of minority over a period of years. The Jefferson Park area serves a disproportionate minority enrollment and the assignment of these students to Tucson High would only exacerbate the problem of ethnic imbalance and in no way improves ethnic balance as required under the consent decree.

■ Furthermore, the reassignment of Cavett students to Santa Rita High School would subject these students to endure a greater burden under this proposal. Minority students should not bear a disproportionate burden in order to meet stated goals of ethnic balance as required in a court ordered school desegregation setting. *Harris,* 968 F.2d at 1097.

Additionally, 250 minority students now attending Catalina and all incoming freshmen would not be provided District transportation to school.

These results disrupt the neighborhood-school concept which the District embraced and aggressively advocated during the Fisher–Mendoza trial. It does not appear that the decision to close Catalina was a product of any community decision or participation.

The potential consequences of the decision to close Catalina would destroy the efforts by many for nearly 15 years since the Fisher–Mendoza agreement and violate the letter and the spirit of the Stipulation of Settlement.

Though the District argues that all of the students will be treated the same regardless of their ethnicity, as asserted by the Respondents and based on the findings of this Court, equal treatment does not necessarily mean equal impact on children. As raised by Plaintiffs Fisher, the greater the adversity on all students, the greater the disproportionate impact is on minority students. The Court heard testimony from parents who stated the difficulties they and their children would encounter due to the distances of travel.[8]

As to the economical hardship, specifically the hardship for the students who are not provided district transportation, it was eloquently stated by Ruben Salter, Jr., counsel for Plaintiffs Fisher, "that simply saying everybody has to get on the bus and ride 20 miles to a school, that does not make it equal.... if one kid goes on the bus with a dollar in his pocket and the other one gets on with a hungry stomach, ... that then would not be equal treatment :..."[9]

While the District sets forth an exhaustive argument in its reply brief that the facts demonstrate that Catalina's closure will not have a legally impermissible impact on minority students, upon examination of the totality of the District's plans to close Catalina and build a new high school in the Southwest area of the District, it is the Court's finding that the effect of this action will result in further segregation with increased minority enrollments at Pueblo and Cholla and a fourth racially identifiable Westside high school.

The District accurately states that how the District chooses to spend its money and run its schools, so long as it does so consistent

---

7. Catalina Respondents Objection to Defendants' Petition to Close Catalina High School and Redrawing of High School Attendance Boundaries, Attachment 1, Table II (Revised) Projected High School Conditions in 2001.

8. Transcript of Hearing, April 22, 1993, Testimony of Parents Bojana Poje Aleman, Angelina Cowart, Janice Miles and Doris Dixon.

9. Transcript of Hearing, April 23, 1993, page 26.

with constitutional mandates, is a matter best left to the discretion of the voters of the District through the democratically elected Governing Board. However, for the reasons set forth, the Governing Board's decision to close Catalina and build a new high school appears to be inconsistent with on-going efforts to reduce segregation and not in the best interest of the community.

The Court is not, and should not be, in the position where it is reviewing or making school board decisions. However, under the original settlement agreement and the standard set forth in *Harris*, the Court cannot approve the decision of the Governing Board to close Catalina High School. Whether the Court relies on the testimony of Governing Board Members Robert Miranda and Joel Ireland, who each testified that the Board did not have all the information now before the Court regarding the effects on minority enrollments, boundary changes and student transportation needs available to them prior to or at the time the Governing Board made its decision to close Catalina High School, or chooses to rely on the testimony of former Board member Sylvia Campoy, who testified that said information was made available, it appears that the District's Governing Board did not take the time to consider all the consequences, most importantly the impact on the on-going efforts of desegregation, before or at the time of its decision.

Though the overcrowding at Pueblo and Cholla High Schools and the projected growth in the Southwest area of the District are genuine concerns, the District cannot remedy this problem in a manner which violates the Stipulation of Settlement and has an adverse impact on other ethnic minority students in the District.[10]

The closure of Catalina, as now proposed, would: (1) increase the minority enrollment at Tucson High with the matriculation of the Jefferson Park area students; (2) place an undue burden on the predominantly minority Cavett Elementary area students;[11] and (3)

result in an additional racially identifiable high school with the building of a new school in the Southwest part of the District, and further have a disparate impact on Pueblo and Cholla enrollment. This, in addition to the decision to close the District's only ethnically-balanced high school, would prove inconsistent and defeat the purpose of this litigation and the Stipulation of Settlement.

Based on the foregoing,

**IT IS ORDERED** that Defendant's Petition for Approval of the Closure of Catalina High School and Redrawing of High School Attendance Boundaries is **DENIED**.

---

10. When asked on cross examination if the Closure of Catalina has an adverse impact on any ethnic minority students, Joel Ireland answered in the affirmative. Transcript of Hearing, April 22, 1993, pages 107–108.

11. Of the 185 Catalina students projected to transfer to Santa Rita for the 1993–1994 school year, 93 percent (172) are minority students.